

```
                IN THE UNITED STATES BANKRUPTCY COURT

                 FOR THE SOUTHERN DISTRICT OF TEXAS

                          GALVESTON DIVISION

IN RE                          )
                               )
THOMAS GALEN MASSEY,           )    CASE NO. 07-80328-G3-7
                               )
         Debtor                )
                               )
                               )
PNK (LAKE CHARLES), L.L.C.     )    ADVERSARY NO. 07-8032
d/b/a L'AUBERGE DU LAC,        )
                               )
         Plaintiff             )
                               )
   v.                          )
                               )
                               )
THOMAS GALEN MASSEY,           )
                               )
         Defendant             )
                               )
```

MEMORANDUM OPINION

The court heard the Complaint To Determine The Dischargeability of A Debt (Docket No. 1) against the Debtor, Thomas Galen Massey. The court, after considering the pleadings, evidence, testimony and argument of counsel, makes the following findings of fact and conclusions of law and renders a Judgment for Debtor, declaring that the debt in the amount of $497,000 owed by Debtor to PNK (Lake Charles), L.L.C. d/b/a L'Auberge du Lac (PNK), is dischargeable. To the extent that any findings of fact are deemed to be conclusions of law, they are hereby adopted as such. To the extent that any conclusions of law are deemed to be findings of fact they are hereby adopted as such.

Findings of Fact

1.  Thomas Galen Massey (Debtor) filed a Chapter 7

proceeding on June 27, 2007. Petition, Main Case Number 07-80328-G3-7.

2. On Schedule F, "Creditors Holding Unsecured Nonpriority Claims," Debtor listed PNK as a creditor for a gambling debt. PNK seeks to have this court declare the debt, in the amount of $497,500, non-dischargeable under section 523(a)(2)(A), based upon false representations made by Debtor, and section 523(a)(2)(B), based upon debtor's use of a materially false, written statement concerning Debtor's financial condition, with the intent to deceive, and upon which PNK relied.

3. Debtor visited the L'Auberge du Lac Casino & Resort on several occasions. A Customer Service Agreement, signed by Debtor and approved by PNK on March 21, 2005, established a line of credit with PNK in the initial amount of $20,000. PNK Exhibit No. 1. A Customer Service Agreement is an application for credit with the casino. Once an application is received and prior to approval, the casino reviews the information on the application and evaluates the creditworthiness of a customer by obtaining bank information, credit reports, and casino gaming information. On March 21, 2005, Debtor filled out the Customer Service Agreement, PNK made the necessary evaluation and it was approved. Oral Video Depositions of Paul Hutchens, Senior Director of Finance, and Kirk Houser, Senior Director of Player Development, for L'Auberge du Lac Casino & Resort.

4. Debtor testified that all of the information contained on the Customer Service Agreement was correct at the time

2

he filled it out. The Agreement reflects that Debtor was employed by LHF Ventures, which was a furniture business and that he had two bank accounts. PNK Exhibit No. 1. Debtor testified that he is the President and Chief Executive Officer of LHF Ventures, which is a holding company that had the exclusive rights to the Lane Home Furnishings brand in Houston and the Golden Triangle area.[1] At the time the Agreement was signed by Debtor, LHF Ventures was an operating furniture business.

     5. From May 2005 to January 2006, Debtor's line of credit was increased pursuant to Debtor's signing and the casino's approving a number of Status Change Forms. PNK Exhibit No. 3. "Markers" may be drawn on a customer's line of credit and the amount indicated on the marker, which resembles a negotiable instrument in the form of a check, is available to a customer for gambling in the casino. Markers are prepared by the casino, signed by the customer, and after a set agreed period of time, the casino generally presents the marker to the customer's bank for payment. Payment of the markers can also be made directly by the customer to the casino. Markers are generally submitted to a bank for payment by PNK anywhere between seven to thirty days after they are signed, but this time could be extended upon a customer's request. Oral Video Depositions of Paul Hutchens and Kirk Houser.

     6. From May 2005 through January 2006, Debtor signed a number of markers and received extensions of credit totaling

---

[1] The "Golden Triangle" is an area of southeast Texas between the cities of Beaumont, Port Arthur and Orange. The term generally refers to the entire Beaumont-Port Arthur-Orange metropolitan area, forming the triangle.

$3,500,000 from PNK. Debtor made payments to PNK on these markers for a total of $3,002,500. Thus the remaining amount at issue is $497,500, represented by six markers which the Debtor signed on the dates reflected thereon, three dated January 28, 2006 and three dated January 30, 2006. PNK Exhibit No. 2.

      7. PNK contends that Debtor signed the January 2006 markers and obtained the extensions of credit knowing that he was unable to repay them. PNK further alleges that Debtor fraudulently misrepresented his ability to pay, upon which PNK reasonably relied, and this resulted in a loss to PNK. Debtor testified that, at the time he signed the January 2006 markers, he had enough funds available to pay the amounts due. Debtor testified that, historically, when casinos issued markers he did not always have that same amount in his bank accounts. Debtor testified that he made payments on markers from gambling proceeds, bank accounts or funds from other sources.

      8. Debtor testified that his furniture business was destroyed by damage sustained from Hurricane Rita on September 23, 2005 and that he expected to receive insurance money for the damage. Ultimately, a controversy developed concerning payment of the insurance proceeds. PNK contends that at the time Debtor signed the January 2006 markers, Debtor knew that the insurance proceeds would not be available to him and that he obtained an extension of credit from PNK knowing he could not repay those markers. Debtor testified that he did not find out that the insurance proceeds would not be forthcoming until eight or nine

months after the hurricane, which would be sometime in May or June 2006. He further testified that none of the payments he made on casino markers from January to March 2006 were attributable to funds received from the furniture business.

9. Kirk Houser, Senior Director of Player Development, testified that even though he knew that Debtor had a furniture business and that it had been destroyed by Hurricane Rita on September 23, 2005, Houser was not concerned about the increases in Debtor's line of credit or about repayment on the January 2006 markers. Houser testified that at the time the markers were signed, Debtor had a "great track record" and that all of Debtor's prior debts and markers had been repaid timely. Houser testified that PNK had a great relationship with the Debtor, and that Debtor was one of PNK's best customers. Houser also testified that he believed that Debtor's intentions were good and that from the date of the initial Customer Service Agreement, March 21, 2005, until May 2006, Debtor timely repaid his markers to PNK. Oral Video Deposition of Kirk Houser.

10. PNK did not present the January 2006 markers for payment to Debtor's bank until May 2006. The markers were returned to PNK with the notation that the account had been closed. Debtor testified that, prior to PNK's presenting the markers for payment, he told PNK that the bank had closed his account and there was no reason to present the markers for payment.

11. The court finds that, at the time the Debtor signed the January 2006 markers, Debtor did not have an intent to deceive

PNK and did not obtain the extension of credit by false pretenses, false representations, or actual fraud. The court further finds that Debtor did not have an intent not to repay PNK. To the contrary, Debtor was considered by PNK to be one of its best customers who historically made timely payments. From March 2005 until May 2006, Debtor made payments of $3,002,500 to PNK on the total $3,500,000 owed. Testimony of Debtor and Oral Video Deposition of Kirk Houser.

   12. The court finds that the information contained in the Customer Service Application dated March 21, 2005 was true and correct at the time it was made and that this information was verified by PNK. The court finds that Debtor did not make materially false statements respecting his financial condition when he filled out the Customer Service Application or signed the January 2006 markers. The court further finds that Debtor had no intent to deceive PNK regarding Debtor's ability to repay. The court finds that Debtor did not use a materially false written statement, false pretenses, false representations, or actual fraud to induce PNK to extend credit to him.

   13. The court finds that PNK has failed to establish by a preponderance of the evidence the elements necessary to have the subject debt declared non-dischargeable pursuant to section 523(a)(2)(A) or section 523(a)(2)(B).

                        Conclusions of Law

   1. Section 523 is governed by a preponderance of the evidence burden of proof which the creditor is required to show

6

that his debt falls within one of these exceptions. *Grogan v. Garner*, 498 U.S. 279 (1991).

    2. A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A).

    3. A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing: (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive. 11 U.S.C. § 523(a)(2)(B).

    4. Elements of fraud under 523(a)(2) are stated as: that the debtor made the representation; that at the time he knew that they were false; that he made them with the intention and purpose of deceiving the creditor; that the creditor relied on such representation; and that the creditor sustained the alleged loss and damage as the proximate result of the representation made. *See In re Houtman*, 568 F.2d 651 (9th Cir. 1978); *In re Miller*, 5 B.R.

7

424 (Bankr. W.D.La. 1980); *In re Pommerer*, 10 B.R. 935 (Bankr. D.C. Minn. 1981); *In re Smith*, 113 B.R. 297 (N.D.Tex. 1990); *Matter of Church*, 69 B.R. 425 (N.D.Tex. 1987).

Based upon these findings of fact and conclusions of law, this court renders a Judgment declaring the debt owed by Debtor to PNK to be dischargeable.  The court will enter a separate Judgment in conjunction with these findings of fact and conclusions of law.

Signed at Houston, Texas on this 10th day of February, 2009.

_____
LETITIA Z. CLARK
UNITED STATES BANKRUPTCY JUDGE